In re MID–ATLANTIC TOYOTA
ANTITRUST LITIGATION.

STATE OF MARYLAND ex rel. SACHS

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

STATE OF DELAWARE ex
rel. GEBELEIN

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

STATE OF WEST VIRGINIA ex
rel. BROWNING

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

DISTRICT OF COLUMBIA ex
rel. ROGERS

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

COMMONWEALTH OF PENNSYLVA-
NIA on its own Behalf and as
Parens Patriae

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

COMMONWEALTH OF VIRGINIA

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

Daniel E. GOLUB, et al.

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

Wallace H. JOHNSTON, Jr., et al.

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

MDL–456.

Civ. A. Nos. Y–80–3238, Y–81–650, Y–81–
726, Y–81–805, Y–81–1880, Y–82–479,
Y–81–806 and Y–81–2954.

United States District Court,
D. Maryland.

May 27, 1983.

See also D.C., 541 F.Supp. 62.

Charles O. Monk, III, Asst. Atty. Gen., and Michael F. Brockmeyer, Asst. Atty. Gen., Baltimore, Md., for plaintiffs.

Raymond W. Bergan, Williams & Connolly, Benjamin R. Civiletti, Venable, Baejter, Howard, & Civiletti, Washington, D.C., for defendants Mid-Atlantic Toyota Distributors, Inc., Carecraft Industries, Ltd., and Frederick R. Weisman.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

The above numbered action is a multidistrict antitrust litigation involving six *parens patriae* actions, 15 U.S.C. § 15c, and two private treble damage actions, 15 U.S.C. § 15. *See generally In Re Mid-Atlantic Toyota Antitrust Litigation,* 560 F.Supp. 760 (D.Md.1983). All plaintiffs and several defendants have submitted a proposed settlement ("the Settlement") to the Court for approval pursuant to 15 U.S.C.

§ 15c(c) and Fed.R.Civ.P. 23(e). The Court has heard the parties' comments on the terms of the Settlement at open hearings on April 29, 1983 and May 26, 1983. In addition, all parties have submitted lengthy memoranda outlining their views on the merits of the Settlement. After careful consideration of the parties' contentions and the relevant authorities, the Court enters an order preliminarily approving the Settlement in its entirety and conditionally determining a temporary settlement class ancillary to the main *parens patriae* classes. The Court stresses the preliminary and conditional nature of these two rulings; they will be followed by another hearing and ruling on 1) the final approval of the Settlement and 2) the possible certification of a permanent settlement class. The principal legal effect of the present order is to allow notice to issue to the potential beneficiaries of the Settlement. The Court will make a final adjudication of the rights of these potential beneficiaries only after they have had a full opportunity to be heard and to exercise any "opt-out" rights they may possess. A fuller explanation of the details of and legal basis for these rulings follows.[1]

All plaintiffs have sued two classes of defendants: Toyota dealers in Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and the District of Columbia ("Dealer defendants"); and several entities essentially comprising the single Toyota distributor for the six jurisdictions ("Distributor defendants").[2] The plaintiffs allege that both sets of defendants have conspired together in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, to force purchasers of certain new 1980 Toyotas to pay more for their cars than they would have paid in the absence of a conspiracy. After extensive briefing by the parties, the Court, at some length, denied the bulk of defendants' motions for summary judgment and held that the case could proceed to trial under a *per se* theory of liability. *In Re Mid-Atlantic Toyota Antitrust Litigation,* 560 F.Supp. 760 (D.Md.1983).

While the summary judgment motions were *sub curia,* counsel for the plaintiffs and Distributor defendants commenced serious settlement negotiations in December, 1982. The negotiating parties did not permit Dealer defendants to participate in these discussions, although they informed Dealer defendants of the basic form of the Settlement by the middle of March, 1983. After four months of intensive negotiations, plaintiffs and Distributor defendants signed the Settlement on April 14, 1983. The Settlement does not purport to seek an order of the Court unilaterally altering any of the formal, legal rights of the non-signatory Dealer defendants. However, the Settlement does give each Dealer defendant the option of joining in the Settlement on or before May 29, 1983. An attempt at a "global" resolution of this litigation, the Settlement explicitly informs the Dealer defendants of the rights and liabilities they would assume if they choose to join. In addition, the Settlement warns them, in advance, that plaintiffs have reserved the option to rescind their agreement with any individual Dealer defendant if the number of Dealer defendants joining the Settlement does not reach a certain "critical mass."[3] The Settlement is intended to be

---

1. While the United States Court of Appeals for the Fifth Circuit has detailed at length why an interlocutory order preliminarily approving a proposed settlement and conditionally determining a temporary settlement class is not appealable, *In Re Beef Industry Antitrust Litigation,* 607 F.2d 167, 180–83 (5th Cir.1979) (Wisdom, J.), the Court has attempted to provide counsel with a written opinion on relatively "short order" should any party choose to seek immediate appellate relief. Consequently, this opinion cannot be quite as comprehensive as might otherwise be appropriate. The Court refers the reader interested in the nature and background of this litigation to its recent summary judgment opinion. *In Re Mid-Atlantic*

*Toyota Antitrust Litigation,* 560 F.Supp. 760 (D.Md.1983).

2. The Court has on occasion referred to the "Distributor defendants" as the "Weisman defendants" to stress the role played within them by defendant Frederick R. Weisman. The terms "Distributor defendants" and "Weisman defendants" should be considered to be synonyms.

3. Section 26 of the Settlement mandates that the plaintiffs retain a right of recission against participating Dealer defendants unless Dealer defendants settling in at least two thirds of the relevant sales of 1980 Toyotas join the Settlement on or before May 29, 1983.

final as between the plaintiffs and Distributor defendants regardless of the number of Dealer defendants who elect to join.

The Settlement is lengthy and complex and the Court will summarize only its most salient features, focusing primarily on the results contemplated if all Dealer defendants join the Settlement. In such a situation, the Settlement mandates the issuance of "certificates" or "scrips" to eligible class members. With one small exception, each of the certificates may be redeemed for (1) $250.00 worth of retail value goods, services or trade-in allowance from a participating Dealer defendant, (2) $135.00 in cash, or (3) some proportionate mixture of the two. While the certificates are freely negotiable for redemption in cash, only the initial recipient of the certificate may exercise the goods, services or trade-in allowance option. These certificates will be distributed to all those who purchased a new 1980 Toyota from one of the Dealer defendants, provided that the vehicle purchased had an accessory which (1) had a list or "sticker" price of at least $425.00 and (2) had at least two of the five components of the so-called "Protective Package" which has formed the basis of this litigation: rust-proofing, exterior paint sealant, undercoating, fabric or vinyl interior protection, and a motor club membership.

The Settlement provides an elaborate procedural mechanism, complete with an adjudicative "Settlement Committee," for determining the identities and number of the actual beneficiaries of the Settlement. While its intricacies need not be outlined here, the Court stresses that all who purchased a new 1980 Toyota from one of the Dealer defendants will be provided with notice and an opportunity to be heard on the issue of whether they qualify as beneficiaries of the Settlement.

The cost of redeeming the certificates will be borne by a Settlement Fund. The Fund shall consist of a contribution of up to $2,900,000.00 from the Distributor defendants, a contribution of up to $1,925,000.00

from the Dealer defendants, and accrued interest. The defendants will be permitted to make less than their maximum contributions only if the total number of identified beneficiaries falls below the 35,000 currently estimated by the parties. The anticipated accrual of interest will allow the issuance of certificates for their full value for up to 36,500 beneficiaries. If the number of beneficiaries exceeds 36,500, then the value of an individual certificate may be reduced.

A Settlement beneficiary may either (1) cash the certificate directly, (2) obtain goods, services or trade-in value from a Dealer defendant, or (3) obtain a proportionate combination of cash, goods, services or trade-in allowance from a Dealer defendant.[4] If the beneficiary exercises any of these options with a Dealer defendant, the Distributor defendants will reimburse the Dealer defendant $135.00, and will in turn be reimbursed by the Settlement Fund $135.00. Thus, as the certificate entitles the beneficiary to $250.00 worth of retail value goods, services or trade-in allowance, but the Dealer is only reimbursed $135.00 in cash, the Dealer defendant absorbs the $115.00 differential of lost retail profit, overhead, or direct costs.

Plaintiffs waive all rights to attorney's fees, except that they reserve the right to receive, in an amount approved by the Court, a segment of any excess Settlement Fund interest remaining after all claims and certain costs have been satisfied. Plaintiffs' counsel currently estimate that they will receive only a small fraction of the fees they have incurred in this case.[5]

The above scenario will only occur if all of the Dealer defendants join in the Settlement. The result occurring if less than all of the Dealer defendants join depends upon the number who join. If Dealer defendants accounting for at least two-thirds of the relevant 1980 transactions opt in, then plaintiffs will either (1) reduce the value of

---

4. The only restriction upon the last option is that the beneficiary must use the certificate for at least $100.00 worth of goods, services or trade-in allowance.

5. While the Settlement is not clear, it appears that plaintiffs' counsel in the private actions will share in this award of fees.

the certificates or (2) delay their disbursement to allow accrued interest and possible executed judgments to make up the shortfall. If less than two-thirds opt in, then plaintiffs will elect either to (1) accept payments from the joining Dealer defendants or (2) rescind the Settlement with all joining Dealer defendants and continue the litigation with the Dealer defendants as a group. In any of these scenarios, the Distributor defendants will be dismissed from the case upon their payment of the amounts agreed upon and their cooperation in any continuing litigation against Dealer defendants.

The Settlement sets out the following schedule:

*May 29, 1983* Deadline for Dealer defendants to join Settlement;

*June 1, 1983* Distributor defendants pay 58.6% and Dealer defendants pay 30% of their total contributions;

*July 1, 1983* Parties complete preliminary identification of beneficiaries;

*August 1, 1983* Settlement Committee completes resolution of disputes over preliminary identification of beneficiaries;

*September 1, 1983* Notice mailed to purchasers of new 1980 Toyotas from Dealer defendants informing them of the preliminary identification of their status to participate/not participate in Settlement;

*September 1, 1983* Distributor defendants pay approximately 38.4% and Dealer defendants pay 30% of their contributions;

*October 1, 1983* Deadline for recipients of notice who were not preliminarily identified as beneficiaries to submit contrary evidence;

*November 1, 1983* Settlement Committee makes final determination of eligible beneficiaries;

*November 15, 1983* Relevant purchasers informed of Settlement Committee's decisions of November 1, 1983;

*December 1, 1983* Deadline for requesting reconsideration by Settlement Committee;

*January 1, 1984* Settlement Committee files final list of beneficiaries with Court;

*February 1, 1984* To extent necessary, Distributor defendants pay $100,000.00 and Dealer defendants pay 40% of remaining contributions; and

*March 1, 1984* Earliest possible date of disbursement to beneficiaries.

Obviously, the above schedule will be delayed if an insufficient number of Dealer defendants choose to opt in. Payments from the Distributor defendants and any eligible Dealer defendants will accumulate interest in the Settlement Fund, but disbursement will await the outcome of the continuing litigation with the remaining Dealer defendants.

## STANDARDS FOR PRELIMINARY APPROVAL

■ Similar standards should govern judicial review of proposed settlements in both *parens patriae* actions and private class actions. *In Re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305, 315 n. 9 (D.Md.1979). The essential inquiry is whether the proposed settlement is fair, adequate, and reasonable. *See, e.g., In Re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 207 (5th Cir.1981); *In Re Beef Industry Antitrust Litigation,* 607 F.2d 167, 179–80 (5th Cir.1979); *Montgomery County,* 83 F.R.D. at 305; *Manual for Complex Litigation* § 1.46 at 56–57 (5th Ed.1982). The late Judge Blair of this District bifurcated the relevant analysis into inquiries on the "fairness" and the "adequacy" of the proposed settlement. On the element of "fairness," Judge Blair indicated:

The factors tending to reveal the fairness of a settlement are those which indicate the presence or absence of collusion among the parties. Because of the danger of counsel's compromising a suit for an inadequate amount for the sake of insuring a fee, the court is obligated to ascertain that the settlement was reached as a result of good-faith bargaining at arm's length. The good faith of the parties is reflected in such factors as the posture of the case at the time settlement is proposed, the extent of discovery that has been conducted, the circumstances

surrounding the negotiations and the experience of counsel.

*Montgomery County,* 83 F.R.D. at 315 (citations omitted). Judge Blair then addressed the second element of "adequacy:"

> In evaluating the 'adequacy' of a proposed settlement, the court must weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement. This necessarily requires the court to make a careful assessment of all the facts and a thorough analysis of the applicable law. It is not, of course, necessary or desirable to 'try' the case to determine whether a settlement is adequate since the very purpose of settlement is 'to avoid the trial of sharply disputed issues and to dispense with wasteful litigation.'
>
> In assessing the adequacy of the proposed settlement, courts should weigh the amount tendered to the plaintiffs against such factors as (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement.

*Id.* at 315–16 (citations omitted).

██ The Court must apply these two general standards within the unique context of a preliminary approval determination. While neither Fed.R.Civ.P. 23(e) nor 15 U.S.C. § 15c(c) specify that a court must follow any particular procedure, the Court has chosen to utilize § 1.46 of the *Manual on Complex Litigation* as a rough procedural framework for reviewing the Settlement. The *Manual* is not mandatory authority, and itself stresses that its "suggestions" need not be strictly adhered to in every application. *Manual on Complex Litigation, supra,* at xx. However, the Court will give the *Manual*'s recommendations every consideration when appropriate in the particular instance. The *Manual* specifically recommends a preliminary approval procedure:

> In a class action, the determination of whether a proposed settlement is fair and reasonable is normally at least a two-step procedure. The first step involves a preliminary determination of whether to give notice of the proposed settlement to members of the class and whether to schedule a hearing at which to receive evidence in support of and in opposition to the proposed settlement. Unless the judge is preliminarily satisfied that the proposed settlement is within the range of possible approval, there is no point in proceeding with notice and a hearing.
>
> Accordingly, rather than automatically accepting the assurances of counsel that the proposed settlement is a good one and should be submitted to the class members, it is usually desirable to have a preliminary hearing.
>
> Such a preliminary hearing is not, of course, a definitive proceeding on the fairness of the proposed settlement, and the judge must be careful to make clear that the determination permitting notice to members of the class is not a finding that the settlement is fair, reasonable, and adequate. In appraising the possibilities and probabilities of recovery and the possible range of damages for the purposes of submitting or approving the settlement proposal, the judge should carefully avoid expression of any opinion that constitutes a prejudgment of the outcome of the litigation or a final judgment on the merits. On the contrary, he should make clear that it is simply a determination that there is, in effect, "probable cause" to submit the proposal to members of the class and to hold a full-scale hearing on its fairness, at which all interested parties will have an opportunity to be heard and after which a formal finding on the fairness of the proposal will be made.

*Id.,* § 1.46 at 62, 64–65. *See Armstrong v. Board of School Directors,* 616 F.2d 305, 314 (7th Cir.1980); *Montgomery County,* 83 F.R.D. at 313. The Court adopts this general procedure for the present case.

## "FAIRNESS" OF THE SETTLEMENT

 Probable cause exists that the Settlement was reached as a result of good faith bargaining at arms length. The four primary participants in the negotiations were two of the chief law enforcement officers of the State of Maryland, a senior partner in one of the most prominent litigation firms in the country, and a former Attorney General of the United States. The Settlement emerged only after several years of hard but honestly fought litigation which has produced one interlocutory appellate decision and four lengthy rulings by the Court. The very intricacy and comprehensiveness of the Settlement suggests the professionalism of its origins. While the Court in no way prejudges the issue of "fairness," and stands ready to entertain any evidence which may subsequently be submitted on the issue, the Court has no problem in finding at the present that probable cause exists that the Settlement was arrived at in an appropriate manner.

## "ADEQUACY" OF THE SETTLEMENT

Similarly, the "adequacy" of the Settlement is well within the range of "possible approval." While the Court might have insisted on certain different provisions had it been a participant in the negotiations, the Court should not substitute its business judgment for the business judgment of the parties whose "business" is involved. *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 426–27 (7th Cir.1977). Focusing instead on the factors Judge Blair suggested, the Court notes that its recent summary judgment ruling implies that the case

would probably go to the jury on a *per se* theory of antitrust liability.[6] On the other hand, the summary judgment ruling only resolves the issue of antitrust "injury" on the level of facial allegations, and does not foreclose a subsequent directed verdict for defendants on that basis should it appear appropriate. *In Re Mid-Atlantic Toyota Antitrust Litigation,* 560 F.Supp. at 784–86. If the case does go to the jury, the Court's experience with antitrust trials suggests that a finding of liability is a significant possibility.

The precise extent of damages, closely related to the existence of antitrust "injury" in the present case, is not altogether clear. *Id.* Indeed, the governing legal measure of damages was only recently specified by the Court. *Id.* at 785–86. However, as the summary judgment ruling indicates, each individual purchaser of a new 1980 Toyota with a Protective Package suffered damages (assuming liability) within the *specific range* of $0 to $535.00. If a sufficient number of Dealer defendants join the Settlement, then the previously described certificates will be issued to all such injured purchasers. The value of these certificates falls within the middle of the range of individualized damages, and may well be an appropriate balancing of the possibly fatal indeterminacy of damages[7] on the one hand, *id.* at 784–85, and the potential trebling of damages on the other, *see* 15 U.S.C. §§ 15(a), 15c(a)(2).[8]

If, alternatively, a sufficient number of Dealer defendants do not join the Settlement, then the "adequacy" of the Settlement would merit perhaps *less* scrutiny.

**6.** The Court again refers the reader interested in a more detailed assessment of the potential evidence to the April 4, 1983 summary judgment ruling.

**7.** The Court stresses that the issue of "damages", like the issue of "injury," has only been resolved at the level of facial allegations. The Court in no way prejudges the resolution of either of these issues when the matters are more fully developed.

**8.** Dealer defendants assert that the Court would irrevocably err by preliminary approving the Settlement before examining the States' economic evidence. While the *Manual on*

*Complex Litigation* does suggest that a court examine the economic evidence before issuing a preliminary approval, *Manual on Complex Litigation, supra,* § 1.46 at 64, the Court believes that rigid application of this recommendation would not be appropriate in the present context. Production of economic evidence would necessitate several months delay, and would disrupt the Settlement's carefully negotiated timetable and equilibrium. In addition, the Court's thorough familiarity with the possible range of recoverable damages in this action leaves it fully satisfied that the Settlement falls within the possible range of adequate settlements.

As federal antitrust law currently provides no right of contribution, *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), the classes would still be entitled to all of their potential recoveries. The Distributor defendants do appear to be the "deeper" and perhaps more uniformly solvent "pocket," but the $80.00 per purchaser contribution they would make is certainly within the range of possible approval as "adequate." [9] In addition, the commitment Distributor defendants have made to cooperate with plaintiffs will certainly benefit the classes, and is an appropriate factor for a court to consider in approving a settlement. *In Re Ampicillin Antitrust Litigation,* 82 F.R.D. 652, 654 (D.D.C.1979); *cf. Wainright v. Kraftco Corp.,* 58 F.R.D. 9, 12 (N.D.Ga.1973) (fact that settling defendant will open files to plaintiff is a factor in concluding that class will not be prejudiced by partial settlement). Similar comments would apply to any Dealer defendant who joins a partial settlement.

Turning to some of the other factors Judge Blair enumerated, the Court agrees with the parties that continuation of this massive litigation will certainly entail significant costs for all involved. As some doubt exists about the solvency of certain Dealer defendants, approval of a settlement in which all of them participate might be prudent, although the Court places little weight upon this factor. Finally, the presence of public law enforcement officers in the settlement process is an appropriate element for the Court to consider in approving that settlement. *Mendoza v. United States,* 623 F.2d 1338, 1353 (9th Cir.1980); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977). Considering all of these factors, but once again not prejudging the issue, the Court finds the Settlement to be within the "possible range" of "adequacy."

The Court notes with some concern the contractual provisions providing for (1) a return to the defendants of certain unclaimed principal and (2) an award to the plaintiffs of attorney's fees from certain excess, unclaimed interest. These terms theoretically provide both sides with some financial incentive to minimize the number of beneficiaries. However, the Settlement has elaborate procedural safeguards favoring the identification of beneficiaries. In addition, the vast majority of beneficiaries will have their interests represented not by private counsel but instead by their respective attorneys general. In any event, the actual results of the identification process will come before the Court again. While these terms do give the Court pause, and certainly should be explored at the final approval hearing, they do not remove the Settlement from the range of possible approval. Similarly, some exploration of the competitive effect of the certificates might be merited later, but it should not derail the orderly workings of the settlement process at this point. Finally, the Court notes that the Settlement paints with a broad brush by providing identical awards to consumers who may have suffered disparate injuries and by giving benefits to certain groups who would not be entitled to participate in a judgment at all. However, the Court recognizes the administrative difficulties in "fine tuning" the Settlement to any greater level of precision than the twenty-four page document already contains. At present, the Court finds these disparities to be no grounds for summarily rejecting the carefully crafted proposal. If settling defendants choose to lavish their money on those they could not be legally liable to, that is their prerogative.

## DEALER DEFENDANTS' OBJECTIONS

Numerous Dealer defendants have strongly objected to various provisions of the Settlement as unduly unfair to them. As of yet, these Dealer defendants have not become parties to the Settlement. The Court frankly acknowledges that, as it pointed out at the April 29 conference, many terms of the Settlement do impose burdens upon the Dealer defendants which do not appear to be equally shared by the Distributor defendants. Indeed, given the

---

9. This is particularly true when one considers the interest which would accrue on their contri-bution pending resolution of the continuing litigation against non-settling Dealer defendants.

fact that the States negotiated the Settlement exclusively with the Distributor defendants, one could scarcely expect otherwise. However, the primary purpose of Fed.R.Civ.P. 23(e) is to protect the absentee class member from the entry of a binding judgment when his interests have not been adequately represented. *Piambino v. Bailey,* 610 F.2d 1306, 1327 (5th Cir.1980); *Shelton v. Pargo,* 582 F.2d 1298, 1303 (4th Cir. 1978); *Norman v. McKee,* 431 F.2d 769, 774 (9th Cir.1970); 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1797 at 226 (1972). Consequently, while the contexts, results and formulations have varied somewhat, the general rule is that a non-settling defendant has no standing to object to a proposed settlement unless his formal, legal rights are prejudiced by the settlement. *Beef Industry,* 607 F.2d at 172–73; 172–73 (5th Cir.1979); *In Re Nissan Motor Co. Antitrust Litigation,* 552 F.2d 1088, 1103 n. 17 (5th Cir.1977) (blanket statement of no standing); *In Re Ampicillan Antitrust Litigation,* 82 F.R.D. at 654 (blanket statement of no standing); *Seifer v. Topsy's International, Inc.,* 70 F.R.D. 622, 631 n. 11 (D.Kan. 1976) (blanket statement of no standing); *Wainright v. Kraftco Corp.,* 53 F.R.D. 78, 81 (N.D.Ga.1971) (stating rule but refusing to issue ruling which would alter legal rights of non-settling defendants); *Philadelphia Electric Co. v. Anaconda American Brass Co.,* 42 F.R.D. 324, 326 n. 1 (E.D.Pa.1967) (blanket statement of no standing); 3 *Newberg on Class Actions, supra,* § 5660b, at 564–65; *cf. In Re Viatron Computer Systems Corp. Litigation,* 614 F.2d 11, 14 (1st Cir.1980) ("non-settling defendant does not

ordinarily have standing to object to a court order approving a partial settlement"). Although some of these cases on occasion speak rather broadly of "prejudice" to the "rights" of the non-settling defendants, a careful analysis of the actual results reached in these decisions reveals that non-settling defendants have standing only when the settlement would alter their formal, legal rights. In particular, non-settling defendants do have standing to object to proposed court approval of a settlement which would bar their rights of contribution and indemnity from settling defendants. *See Altman v. Liberty Equities Corp.,* 54 F.R.D. 620 (S.D.N.Y.1972); *Wainright v. Kraftco Corp.,* 53 F.R.D. at 81; 3 *Newberg on Class Actions, supra,* § 5660b, at 565.[10] In the present case, Dealer defendants have presented no arguments demonstrating that approval of the Settlement would produce a judicial order unilaterally altering their formal, legal rights.[11] While the Settlement does purport to outline various rights and responsibilities for the Dealer defendants, these rights and duties become obligatory upon an individual Dealer defendant only if that Dealer defendant chooses to assume them. In effect, the Dealer defendants request the Court to relieve them of the burden of making a tactical litigation decision which they regard as a Hobson's Choice. The Dealer defendants complain that they must choose between joining a burdensome settlement or proceeding through a protracted and expensive litigation with the Distributor defendants realigned against them. However, litigation is not an activity for the kind of heart or the gentle of

**10.** *Florida Power Corp. v. Granlund,* 82 F.R.D. 690 (M.D.Fla.1979), is the only case which has gone beyond protecting the non-settling defendants rights to indemnity and contribution. In *Granlund,* the court refused to approve a settlement which would create a previously non-existent right of indemnification in the settling defendant, expose the non-settling defendants to the risk of multiple litigation, and prohibit the non-settling defendants from exercising an otherwise valid *in pari delicto* defense. The Court notes that all of the rights vindicated in *Granlund* were once again formal, legal rights.

**11.** Dealer defendants make no arguments relative to the potential impairment of their contri-

bution rights. No right to contribution exists under the federal antitrust laws. *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). While the complaint also asserts violations of various state statutes, Section 28 of the Settlement expressly provides for a *pro rata* reduction of damages recovered by the plaintiffs against the non-settling defendants should a court subsequently determine that a right of contribution exists. Such a reduction would remove the right to contribution, since the non-settling defendants would not be liable for more than their proportionate share. *See Altman v. Liberty Equities Corp.,* 54 F.R.D. at 624.

spirit. Fear of prosecution for a capital offense may impel a criminal defendant to plead guilty to a lesser charge, but this in no way implies that the plea is not voluntary, knowing, and intelligent. *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970). Similarly, plaintiffs in ordinary civil actions routinely engage in a "divide and conquer" settlement strategy among multiple defendants. The unique *res judicata* aspects of a class action judgment mandate judicial solicitude on behalf of the absentee class members at the time of a proposed class action settlement, but this does not compel the Court to assume the unaccustomed role of general arbiter of the substantive fairness of a settlement vis-a-vis all parties to the action.[12] The Court holds that the arguments made by Dealer defendants are not relevant to the preliminary determination of whether the Settlement is fair, adequate and reasonable.

## FORMATION OF A TEMPORARY SETTLEMENT CLASS

 The present *parens patriae* actions are pursued on behalf of natural persons currently residing within the respective plaintiff States who have not previously "opted out" of these actions. By negative implication, purchasers of new 1980 Toyotas in the Mid-Atlantic region who are "non-natural" commercial entities, who have since moved from the Mid-Atlantic region, or who have previously "opted out" of the *parens* actions are not currently participants in this litigation. Nevertheless, in keeping with its "global" scope, the Settlement purports to provide benefits to all who purchased a new 1980 Toyota from one of the Dealer defendants with an accessory which had a suggested retail price of at least $425.00 and which included two or more items of the "Protective Package." To remedy this disparity between the compositions of the (1) current plaintiffs and (2) the proposed beneficiaries, the Court enters an order conditionally determining a Temporary Settlement Class[13] in the "umbrella" multi-district action MDL–456. Counsel for the plaintiffs in Civ. Action Nos. Y–81–806 and Y–81–2954 shall be joint counsel for the Temporary Settlement Class. Current plaintiffs in Nos. Y–81–806 and Y–81–

12. Dealer defendants attempt to distinguish the overwhelming mass of authority reviewed above on the grounds that none of the settlements under scrutiny in those cases purported to establish the terms upon which a non-signatory could join the agreement. While the Settlement does appear to be unique in that respect, the argument provides Dealer defendants with no relief. Under the above authorities, Dealer defendants would have had no standing to object to a pure partial settlement between plaintiffs and Distributor defendants which did not curtail their formal, legal rights. The fact that Distributor defendants would subsequently cooperate with the plaintiffs would be a "well established" ground for *approving* such a partial settlement. *In Re Ampicillin Antitrust Litigation,* 82 F.R.D. at 654. Given the Dealer defendants' clear lack of standing in a pure partial settlement, the fact that the signatory parties have attempted to give the Dealer defendants an alternative option *to* proceeding alone in this protracted litigation does not suddenly create standing. The "opt in" provisions of the Settlement do not lie at the root of the Dealer defendants' objections; the prospect of continuing this expensive litigation alone does. In purely practical terms, the existence of the global settlement with its "opt in" provision leaves the Dealer defendants better off than if

Distributor defendants and plaintiffs had struck the standard "separate deal." As the signatory parties had the unquestioned right to leave the Dealer defendants as the sole defendants in this case, they certainly are free to provide the Dealer defendants with a potentially more palatable alternative to that situation. Simply put, "standing" cannot be conferred on Dealer defendants because of provisions in the Settlement which can only help the Dealer defendants.

13. A temporary settlement class is a class tentatively formed for the purposes of anticipated settlement only. Completely ancillary to the proposed settlement, it lasts only as long as the period between the preliminary approval of the settlement and the court's final determination on the settlement. At the time of the court's final adjudication of the proposed settlement, the court decides whether or not to certify a permanent settlement class. In effect, a temporary settlement class serves only as a procedural vehicle for providing notice to putative members of a proposed class of the terms of the anticipated settlement and of their opportunity to "opt out" and/or object. *See generally Beef Industry,* 607 F.2d at 173–78; 3 *Newberg on Class Actions, supra,* at § 5570c.

2954 shall be the representative parties of the Temporary Settlement Class. The Temporary Settlement Class shall automatically expire when the Court issues a joint ruling on the issues of (1) the final approval or disapproval of the Settlement and (2) the certification or non-certification of a permanent settlement class.[14] The Temporary Settlement Class shall consist of all purchasers of a new 1980 Toyota from a Dealer defendant who are not natural persons, who no longer reside in the Mid-Atlantic states (Delaware, Maryland, Pennsylvania, Virginia, West Virginia or the District of Columbia), or who have opted out of one of the six pending *parens patriae* actions. The Court has specifically expanded the Temporary Settlement Class to include some purchasers ostensibly not entitled to benefits under the Settlement. The reason for this expansion is to provide all purchasers of a new 1980 Toyota from a Dealer defendant with the procedural safeguards which the Settlement establishes for the accurate identification of its beneficiaries. Consequently, membership in the Temporary Settlement Class does not necessarily indicate membership in any later permanent settlement class. Members of the Temporary Settlement Class shall receive appropriate notice of their inclusion in the Temporary Settlement Class at the same time they receive notice of the Court's preliminary approval of the Settlement shall be mailed September 1, 1983, counsel should provide the Court with a Proposed Notice for Temporary Settlement Class members by August 1, 1983. This Proposed Notice should be fully supported by legal authority. *See, e.g., Beef*

*Industry,* 607 F.2d at 178–79 (discussing legal sufficiency of notice).

Judge Minor Wisdom of the United States Court of Appeals for the Fifth Circuit has provided a comprehensive review of the authorities and policies supporting the creation of a temporary settlement class. *Beef Industry,* 607 F.2d at 173–78.[15] The Court will not repeat those arguments here, except to note that the principal practical benefit of a joint order preliminarily approving a proposed settlement and conditionally determining a temporary settlement class is that it clearly establishes the financial benefits of participating in a class settlement and hence provides the putative class members with a more informed choice for opting in or out of the class. As Judge Wisdom summarized:

> It is fair to state that as the law now stands, tentative or temporary settlement classes are favored when there is little or no likelihood of abuse, and the settlement is fair and reasonable and under the scrutiny of the trial judge.

*Beef Industry,* 607 F.2d at 174. The primary "abuse" feared by the courts is that defendants will play potential class counsel off against each other to find the "lowest bidder" at the expense of the members of the nascent class. These concerns are simply not present here. The Settlement has been negotiated not by private counsel but by public law enforcement officers.

If the Settlement receives approval, the eligible members of the Temporary Settlement Class will receive benefits identical to

**14.** If a sufficient number of Dealer defendants do not join the Settlement, and notice to consumers does not issue, the Temporary Settlement Class will also automatically expire. The Court would then consider "recreating" a Temporary Settlement Class at any later date that notice might issue.

**15.** The Court stresses that the "temporary settlement class" being addressed today was *not* considered by the United States Court of Appeals for the Fourth Circuit in *Shelton v. Pargo, Inc.,* 582 F.2d at 1298. *Shelton* held that potential class members need only be given notice of a proposed *precertification* settlement if the district court determines after a hearing that the precertification settlement has been the

product of collusion or that putative class members have detrimentally relied upon the assumed maintenance of the class action. As the Fourth Circuit noted, a precertification settlement "binds solely the individual plaintiff and not absentee class members." *Shelton v. Pargo, Inc.,* 582 F.2d at 1303. In the present case, on the other hand, the signatory parties clearly intend that the Settlement will bind members of the Temporary Settlement Class. To avoid any confusion in this area of occasional terminological looseness, the Court reiterates that it is presiding over the "temporary settlement class" discussed in *Beef Industry* and not the "precertification settlement" considered in *Shelton.*

those conferred upon the members of the *parens* classes. The unique circumstances of the present case, with the Temporary Settlement Class essentially "parallel" to the main *parens* actions, leaves the Court confident that the abuses extensively discussed in *Beef Industry* are not present here.[16] As the Court has preliminarily determined the Settlement to be "fair" and "reasonable," and as the Settlement is under the continuing scrutiny of the Court, all of the prerequisites identified in *Beef Industry* for the conditional determination of a temporary settlement class exist here.

The conditional determination of a temporary settlement class does not constitute an "all purposes" certification, and in particular does not certify a litigation class should the supervising court subsequently disapprove the proposed settlement. Consequently, it is unclear whether the full findings required for a formal class certification need to be made. *See Beef Industry,* 607 F.2d at 177–78; 3 *Newberg on Class Actions, supra,* § 5570c, at 477–79. To the extent they are required, the Court finds that the Temporary Settlement Class, as a

temporary settlement class, fulfills all of the prerequisites of Fed.R.Civ.P. 23(a)[17] and Fed.R.Civ.P. 23(a)(3).[18] In particular, the "adequacy" requirement of Fed.R.Civ.P. 23(a)(4) is met within the limited context of the proposed settlement. The Court of course recognizes that it has previously denied ordinary class certification to two groups of aspiring representative plaintiffs on the grounds that the cost reimbursement arrangements of the representative plaintiffs' counsel violated the disciplinary rules of the relevant jurisdictions and hence rendered suspect their ability to fairly and adequately protect the interests of their classes. *In Re Mid-Atlantic Toyota Antitrust Litigation,* 93 F.R.D. 485 (D.Md.1982). The Court stresses that it does not retreat from this prior holding: if the Court does not give final approval to the Settlement, then the Temporary Settlement Class will automatically dissolve, and attempts at ordinary class certification for full litigation purposes will still be governed by the principles enunciated in the earlier opinion. However, the "representatives" of the members of the present Temporary Settle-

16. These same factors serve to distinguish the present case from the primary appellate discussion of temporary settlement classes since *Beef Industry, Plummer v. Chemical Bank,* 668 F.2d 654 (2nd Cir.1982). In *Plummer,* counsel for the putative class had negotiated the proposed settlement prior to the filing of the complaint, and the named plaintiffs appeared to receive more favorable settlement terms than the unnamed members of the prospective class did. The district court disapproved the settlement, and the Circuit Court affirmed stressing the factors noted above. As outlined previously, no such indicia of collusion or overreaching exist in the present case. It should also be noted that *Plummer* involved a final disapproval of a settlement and a denial of certification for a permanent settlement class. The step mandated by the present ruling, notice to prospective members of a permanent settlement class, was in fact undertaken without comment in *Plummer. Plummer,* 668 F.2d at 657.

17. As the estimated membership in the proposed class exceeds 3000, joinder is impracticable. Fed.R.Civ.P. 23(a)(1). As outlined in detail in the April 4, 1983 opinion, members of the class may have suffered at the hands of a large antitrust conspiracy, so common questions of law and fact obtain. Fed.R.Civ.P. 23(a)(2). Similarly, the antitrust claims of the representatives are typical of the antitrust claims that

any purchaser of a new 1980 Toyota from a Dealer defendant would attempt to assert. Fed.R.Civ.P. 23(a)(3). The "adequacy" determination of Fed.R.Civ.P. 23(a)(4) is discussed *infra* in the body of the opinion.

18. While damages may vary among individual purchasers, common questions of law and fact clearly predominate, and a class action certainly is superior to other methods, if any are available, of fairly and efficiently adjudicating this controversy. As the amount of damages suffered by an individual purchaser is relatively small, the purchaser would have little interest in maintaining a separate action. Fed.R.Civ.P. 23(b)(3)(A). Litigation over factually identical claims is currently before the Court and it makes excellent sense to resolve these matters simultaneously. Fed.R.Civ.P. 23(b)(3)(B). The fact that the Panel on Multi-district Litigation has transferred all actions relating to these matters to the Court indicates the desirability of concentrating the litigation of the class claims in this forum. Fed.R.Civ.P. 23(b)(3)(C). Finally, any "difficulties likely to be encountered in the management of a class action," if they exist in the instant action, are already being encountered by the Court in the parallel *parens* actions. Fed.R.Civ.P. 23(b)(3)(D).

ment Class have in effect been public law enforcement officers, who, as stressed before, have negotiated identical settlement for their own citizens on the basis of essentially equivalent factual claims. In light of the unique factors of this proposed settlement, and the conditional nature of this determination, the Court cannot say that the class representative will not fairly and adequately protect the interests of the class members during its brief and limited existence. As Judge Wisdom has observed:

> it is altogether proper and consistent for a court to certify a class for settlement purposes while it might have had more difficulty reaching this determination in a different context.

*Beef Industry,* 607 F.2d at 178 (quoting 3 *Newberg on Class Actions, supra,* § 5570c at 479–80).

For the foregoing reasons, it is this 27th day of May, 1983, by the United States District Court for the District of Maryland, ORDERED:

1. That plaintiffs' and Distributor defendants' motions for the preliminary approval of the proposed Settlement BE, and the same ARE, hereby GRANTED;

2. That a Temporary Settlement Class BE, and the same IS, hereby CONDITIONALLY DETERMINED in accordance with the rulings enunciated above; and

3. That defendants who are not signatories to the Settlement shall have until 5:00 p.m., June 3, 1983 to elect to join the Settlement, pursuant to the agreement of the signatory parties in open court on May 26, 1983.