In re MID–ATLANTIC TOYOTA ANTITRUST LITIGATION.

This Opinion Relates to all consolidated actions:

STATE OF MARYLAND ex rel. SACHS

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

STATE OF DELAWARE ex rel. GEBELEIN

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

STATE OF WEST VIRGINIA ex rel. BROWNING

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

DISTRICT OF COLUMBIA ex rel. ROGERS

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

COMMONWEALTH OF PENNSYLVANIA on Its Own Behalf and as Parens Patriae

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

COMMONWEALTH OF VIRGINIA

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

Daniel E. GOLUB, et al.

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

Wallace H. JOHNSTON, Jr., et al.

v.

MID–ATLANTIC TOYOTA DISTRIBUTORS, INC., et al.

MDL No. 456.

**1554**

Civ. A. Nos. Y–80–3238, Y–81–650, Y–81–726, Y–81–805, Y–81–1880, Y–82–479, Y–81–806 and Y–81–2954.

United States District Court,
D. Maryland.

May 9, 1984.

Michael F. Brockmeyer, Asst. Atty. Gen., Baltimore, Md., liaison counsel, for plaintiffs.

Joseph L. Bianculli, Washington, D.C., liaison counsel, for defendants.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

This action is a multidistrict antitrust litigation involving six *parens patriae* actions, 15 U.S.C. § 15c and two private treble damages actions, 15 U.S.C. § 15, which have been consolidated. *See generally In Re Mid-Atlantic Toyota Antitrust Litigation,* 560 F.Supp. 760 (D.Md.1983). All plaintiffs have submitted motions for preliminary approval of proposed settlement agreements and dismissals pursuant to 15 U.S.C. § 15(c) and Fed.R.Civ.P. 23(e), and a motion for approval of plan of notice. After consideration of the parties submissions and the relevant authorities, the Court will enter an order preliminarily approving the settlement agreements, and the dismissals, as well as an order approving the proposed plan of notice. The Court stresses the conditional nature of these rulings; a final adjudication of the rights of potential beneficiaries will be made only after there has been an opportunity for them to be heard

and to exercise any "opt-out" rights they may possess.

All plaintiffs have sued two classes of defendants: Toyota Dealers in Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and the District of Columbia ("Dealer defendants") and Mid-Atlantic Toyota Distributors, Inc., Carecraft Industries, Ltd. and Frederick R. Weisman ("Distributor defendants"). The plaintiffs allege that both sets of defendants conspired together to force purchasers of new 1980 Toyotas to pay more for their cars than they would have absent the conspiracy. *See generally In Re Mid-Atlantic Toyota Antitrust Litigation, supra.* On May 27, 1983, this Court preliminarily approved a proposed settlement ("Original Settlement Agreement") between all plaintiffs and the Distributor defendants. *In Re Mid-Atlantic Toyota Antitrust Litigation,* 564 F.Supp. 1379 (D.Md.1983). Designed to achieve a "global" resolution of this litigation, that Settlement Agreement gave each Dealer defendant the option of joining in the Settlement. The Settlement Agreement provided that if Dealer defendants accounting for less than two-thirds of the vehicles agreed to participate, plaintiffs had the option of either rescinding the agreement with the Dealer defendants who had opted in and prosecuting the case against all Dealer defendants, or agreeing to settle with the Dealer defendants who wished to participate and continuing to prosecute the case against the remainder. When an insufficient number of Dealer defendants chose to join, Maryland, Virginia, and the District of Columbia exercised the latter option which resulted in settlements with twenty-five Dealer defendants. Pennsylvania chose not to settle with the nine Pennsylvania Dealer defendants who wished to participate in the Settlement Agreement. The private plaintiffs decided to settle with the thirty-four settling Dealer defendants. The five solvent West Virginia Dealer defendants declined to participate in the Settlement. The Delaware Dealer defendants subsequently agreed to the terms of the Settlement Agreement.

## THE PROPOSED SETTLEMENT AGREEMENTS

Since the summer of 1983, plaintiffs have continued the litigation against non-settling defendants while engaging in settlement negotiations in an attempt to achieve a "global" settlement. Settlement agreements have now been reached with all Dealer defendants. Many of the terms of those agreements are similar to those contained in the Settlement Agreement with Distributor defendants which this Court has already preliminarily approved. The salient features of the Distributor Settlement Agreement are summarized in *In Re Mid-Atlantic Toyota Antitrust Litigation,* 564 F.Supp. 1379 (D.Md.1983). The changes in that Agreement wrought by the proposed settlements with Dealer defendants are as follows:

### Delaware, Maryland, Virginia and the District of Columbia

Delaware, Maryland, Virginia, and the District of Columbia, and the relevant private plaintiffs, have proposed several amendments to the Settlement Agreement. The proposed terms apply to all Dealer defendants in the Delaware and District of Columbia cases. In the Maryland and Virginia cases, the terms apply to all Dealer defendants except Fulker Toyota, Inc., Best Toyota, Inc., Schaefer & Strohminger, Inc., Ross Toyota Sales, Inc., College Toyota, Inc., and Toyota of Roanoke Valley, Inc. Despite different settlement terms with these six Dealer defendants, qualified purchasers who purchased from these dealerships will receive the same benefits as all purchasers represented by Delaware, Maryland, Virginia, and the District of Columbia.

Under the proposed amendments, qualified purchasers will continue to have the option of receiving either $135 in cash or $250 in goods and services, although the amendments impose additional restrictions on the goods and services option. Purchasers opting for goods and services will have to choose from a list of frequently used

repair services, or the purchase of a new or used vehicle. The coupon for goods and services now has a one-year life rather than a two-year life, and can only be used once. Any unused balance will be refunded to the purchaser at a rate of $.54 to $1.00. The amendments restrict redemption to the dealership from which the vehicle was purchased if the purchaser now lives within 25 miles of that dealership. If the original dealership is further than 25 miles, out-of business, or located in Pennsylvania or West Virginia, the coupon may be redeemed at any settling dealership. In contrast, under the Settlement Agreement there was no limit on the number of times the coupon could be used and the coupons could be redeemed at any settling Dealer.

The amendments also provide that Dealer defendant payments will differ depending upon the date of settlement. Those defendants that accepted the original Settlement Agreement will have the advantage of the ceiling on payments set forth in that Agreement. In accordance with that Agreement, they will be obligated to pay $55 per vehicle up to the ceiling of a region-wide total of 35,000 cars. Those Dealer defendants who settled after September 30, 1983, are subject to a flat $55 payment for each 1980 Toyota sold with a qualifying protective package. Moreover, under the amendments, any monies remaining after all approved costs, expenses, and attorneys' fees are paid, will be returned to defendants in the following order of priority: each defendant who redeems a coupon from a purchaser who had not purchased from that Dealer defendant, shall receive up to $80.00 for each redeemed coupon; each defendant who redeems a coupon from a purchaser who bought from it, will receive up to $50.00 for each coupon. Any funds remaining after these disbursements will be refunded to the defendants, in proportion to their contributions.

In addition to moving for preliminary approval of these amendments, plaintiffs have moved for preliminary approval of five settlement agreements reached with individual Dealers located in Maryland and Virginia. Although purchasers from these individual dealerships will obtain the same benefits as purchasers from other Maryland and Virginia Dealers, different settlement terms have been reached with respect to these five Dealers. In reaching settlement agreements with Ross Toyota, Sales, Inc., a Virginia dealership, Fulker Toyota, Inc., a Baltimore dealership, and Best Toyota, Inc., a Cumberland, Maryland dealership, plaintiffs considered the possibility that the dealerships would become insolvent or go out-of-business. The Virginia Attorney General concluded that litigation costs and attorney's fees alone would destroy Ross Toyota's ability to satisfy a litigated judgment. Ross Toyota settled for approximately $60.94 per vehicle. Fulker Toyota was preparing a bulk transfer of its assets under the Uniform Commercial Code when it agreed to settle for $55.00 per vehicle. Best Toyota did not become an authorized Toyota Dealer until November, 1979, and its principal did not attend any of the Distributor sponsored meetings held in September, 1979. It is now insolvent. It settled for approximately $24.19 per vehicle. All three of these dealerships have promised to cooperate in the future prosecution of this litigation, and to post notice to consumers at the dealerships. Plaintiffs have agreed to release claims against these dealerships relating to the transactions alleged in this case. These settlement agreements provide for entry of a consent decree similar to the one attached to the Original Settlement Agreement. The separate settlement agreements with Schaefer & Strohminger, Inc., a Maryland dealership, and Toyota of Roanoke Valley, Inc., a Virginia dealership, obligate the Dealers to pay $55 per vehicle. The terms of the agreements are similar to those provided in the amendments proposed to the Original Settlement Agreement proposed by plaintiffs except as to the timing of settlement payments, and the return of undistributed funds.

*Pennsylvania*

Pennsylvania elected to rescind the Original Settlement Agreement as to those Dealer defendants who opted in. Instead, Pennsylvania has negotiated separate agreements with the forty-six Pennsylvania Dealer defendants. Those agreements provide the same non-monetary terms to all defendants and the same benefits to each qualifying consumer. However, there are differences as to monetary terms among the Dealers.

Under the Pennsylvania agreements, consumers will receive a check for $150 which must be cashed within six months. Unlike the Original Settlement Agreement, there is no provision for coupons redeemable for goods and services. An elaborate mechanism determines eligibility, and if there are any disputes which cannot be resolved among the parties, the dispute will be referred to the Settlement Committee established under the Original Settlement Agreement. Like the Original Settlement Agreement, all who purchased new 1980 Toyotas from the defendants will have an opportunity to be heard on the issue of whether they qualify. *See* 564 F.Supp. at 1382. The settling Dealer defendants have agreed to the entry of final judgment including an injunction against price-fixing arrangements for five years. The Dealers have agreed to provide vehicles without protective packages on demand and to post notices to that effect. The agreements also provide for cooperation of Dealer defendants in further prosecution of the litigation. Moreover, differing pay schedules have been negotiated with some Dealers depending on their current ability to pay.

Many of the Dealers have settled on the basis of $69.00 per vehicle. Dealers who settled early in the litigation, who were threatened with insolvency, or who have gone out-of-business have settled for less. For example, Bruce Browne, Inc. has settled for $8,000[1] after providing plaintiffs with information valuable to the prosecution. Other settlements were negotiated with Chester Mack Toyota, Inc. and Key Toyota, Inc. on a lower per car basis because of their financial inability to pay more: Chester Mack was in the process of selling the dealership at the time of settlement, and Key Toyota, Inc. had gone out-of-business. Similarly, settlements with Bud Haas Toyota, Inc., McCrackin-Sturman Toyota, Inc. and University Toyota, Inc. were lower because they were out-of-business, and had a demonstrated inability to pay more. Rohrich Cadillac, Inc. was able to negotiate a lower settlement which included no injunctive relief because it did not become a Toyota Dealer until 1980 and did not attend any of the alleged meetings to facilitate the conspiracy.

The proposed agreements with Dealer defendants who settled after April 14, 1983, the date of the Original Settlement Agreement, contains a recapture provision permitting the return of any unused principal to all Pennsylvania Dealer defendants. However, under certain conditions Pennsylvania may retain up to $8,000 of unclaimed principal as reimbursement for payments made to purchasers out of interest monies. Moreover, if more than $8,000 of interest is used to make such payments, Pennsylvania may retain unclaimed principal payments payable to Dealer defendants settling before April 14, 1983, to make up the deficiency. Any rebate due to certain Dealer defendants who made reduced contributions will be paid to the Attorney General's office for antitrust enforcement purposes.

Pennsylvania has also filed an amendment to the Original Settlement Agreement which provides for payment to the Com-

---

1. This settlement agreement was the first to be negotiated by Pennsylvania. It contains a so-called "most favored nations" clause. Because a lower settlement per vehicle was negotiated with Bud Haas Toyota, Inc., the original settlement figure of $9,500 was reduced to $8,000 in accordance with that clause. Although this Court does not find that inclusion of such a clause renders preliminary approval inappropriate, it notes that "most favored nation clauses" are generally considered undesirable. *See Manual For Complex Litigation* § 1.46.

monwealth of the amount equal to the proportion of the Distributor defendants' contribution to the Settlement Account and accrued interest which would be payable to Pennsylvania purchasers.

*West Virginia*

West Virginia has entered into settlement agreements with its Dealers which tracks the Original Settlement Agreement in many respects but which proposes a per car payment to consumers of $125. The State of West Virginia originally filed suit against eight West Virginia Dealer defendants. Since that time, three of the Dealers have become insolvent and gone out-of-business. In late 1981, the remaining five West Virginia Dealer defendants reached an agreement in principal for settlement which provided for a cash indemnity but not for a "goods and service" option. These Dealers subsequently declined to join the Original Settlement Agreement because it included a "goods and services" option. The proposed settlement agreement substantially reflects the agreement reached in 1981. It is coextensive with the Distributor Settlement Agreement as to the definition of consumers, injunctive relief, attorney's fees and costs, and cooperation by the five settling defendants. Under the proposed agreement, each Dealer's contribution reflects a payment of $50.00 per car with an additional $1,500 premium in settlement of West Virginia's pendent state antitrust claims. This yields a per car figure of between $53.00 and $55.00. However, because there will probably be no recovery from three out of the eight West Virginia Dealers, the per car average will be diluted to approximately $45.00. Under these circumstances, purchasers will recover $125.00 without reference to the dealership from which the car was purchased. The agreement also provides for entry of a consent decree that would enjoin defendants from entering into any price-fixing conspiracy for a period of three years. Dealers are required to post notice to consumers that they will use best efforts to supply vehicles without protective packages if the buyer so desires.

## MOTIONS TO DISMISS

Plaintiffs have also moved for preliminary approval of the dismissal of claims against a Virginia dealership, College Toyota, Inc., and three West Virginia dealerships, Import City, Inc., Mountain View Toyota, Inc., and Valley Toyota, Inc. pursuant to 15 U.S.C. § 15(c) and Fed.R.Civ.P. 23(a).[2] The West Virginia Dealers are insolvent and out-of-business. College Toyota, Inc. filed a Chapter 11 petition on May 23, 1980, which subsequently converted to a Chapter 7 liquidation proceeding. The manager and principal owner of the dealership, Irving C. Newcomb, Jr., and his wife have sought an adjustment of their personal debts under Chapter 13. In early 1982, the plaintiffs reached an agreement with Newcomb whereby he would voluntarily provide information in exchange for dismissal of the action filed against College. Since that time, Newcomb has cooperated with plaintiffs in providing information concerning the alleged conspiracy. Plaintiffs, therefore, seek College Toyota's dismissal pursuant to that agreement.

## STANDARDS FOR PRELIMINARY APPROVAL

This Court has recently reviewed the standards governing judicial review of proposed settlements in both *parens patriae* and private class actions. *See In Re Mid-Atlantic Toyota Antitrust Litigation*, 564 F.Supp. 1379, 1383–84 (D.Md.1983). Those standards apply to the Court's consideration of the instant proposed settle-

---

**2.** The Court understands that plaintiffs also intend to move for dismissal of Henry Kehl Enterprises, Inc., a Pennsylvania Dealer, on the grounds that its Chapter 11 petition will soon be converted into a Chapter 7 liquidation proceeding. This Court will consider a motion for preliminary approval of dismissal at a later date.

ment agreements with and dismissals of Dealer defendants.[3]

## "Fairness" of the Settlements

Probable cause exists that these settlements were reached as a result of good faith bargaining at arms length, just as it did for the Settlement Agreement with Distributor defendants. The negotiations were conducted by members of the Attorneys General offices of the states involved and emerged after protracted litigation. Discovery has been ongoing. Moreover, as with the Original Settlement Agreement, the "very intricacy and comprehensiveness" of these agreements "suggest[ ] the professionalism of [their] origins." 564 F.Supp. at 1385. Although this Court has not prejudged the issue of fairness, the Court finds that probable cause exists that the agreements in question were reached in an appropriate manner.

## "Adequacy" of the Settlement Agreements

Similarly, the adequacy of the proposed settlements is also well within the range of "possible approval." 564 F.Supp. at 1385. Many of the Court's statements concerning the Original Settlement Agreement are equally applicable here. It is just as probable that the case would go to the jury on a *per se* theory of antitrust liability as it was when this Court preliminarily approved the Original Settlement Agreement. There is still a possibility that a directed verdict for defendants would be appropriate, while continuation of the litigation will undoubtedly entail significant costs for all parties. *Id.* Approval of a settlement seems prudent when there is ongoing concern as to the solvency of some Dealer defendants. *Id.* at 1386. Moreover, the presence of public law enforcement officers in the settlement process weighs in favor of approval of a settlement.

The plaintiffs have also submitted economic evidence to support preliminary approval of the settlements. *Compare* 564 F.Supp. at 1385 n. 8. Drs. Charles Berry and Stephen Goldfeld of Princeton University, and Dr. Roderick Little conducted an economic analysis to estimate the extent of damages suffered by persons or business entities purchasing Toyota vehicles from defendant Toyota Dealers during the period in which the alleged conspiracy was in force. On the basis of that analysis, Dr. Berry has submitted an affidavit stating:

> quarterly estimates of the average dealer gross profit during the period January, 1978 through December, 1980 provides the best available means of estimating Toyota purchaser injury as a result of the alleged conspiracy. Dealer gross profit is the difference between a dealer's cost of the vehicle including all options and the final consumer purchase price. Specifically, I reviewed the average gross profit of the twelve Toyota dealers surveyed for each of the twelve quarter-year periods from January, 1978 through December, 1980. For this period as a whole, the average dealer gross profit per transaction for all Toyota models was $676. During the nine quarters —January, 1978 through September, 1979 and July, 1980 through December, 1980—the average dealer gross profit was $638, or $38 less than the corresponding average throughout the entire period. In contrast, during the three quarters—October, 1979, through June, 1980—the average dealer gross profit per transaction was $98 above this overall average, for a total of $774. The difference, therefore, between the average gross profit during the period October, 1979 through June, 1980 and the average dealer gross profit during the quarters before and after that period

---

**3.** Although the *Manual For Complex Litigation* § 1.46 indicates the desirability of a preliminary hearing on the proposed settlements, this Court does not find such a hearing necessary in light of the preliminary hearings already held con-

cerning the original Settlement Agreement. *Compare In re General Motors Corporation Engine Interchange Litigation,* 594 F.2d 1106, 1133 (7th Cir.1979).

was $136. This indicates that during the three quarters when the challenged port-installed protective package program was in effect, prices of Toyota vehicles purchased from these twelve dealers averaged $136 more above dealer costs than did the average price of these vehicles during the nine quarters when this program was not in effect. This difference of $136 has a calculated standard error estimate of $22.

Actual consumer prices of 1980 Toyotas were affected by both dealer costs and dealer gross profit. Dealer costs include the cost to the dealer of any protective package installed on the vehicle sold. Average consumer prices paid for 1980 Toyotas during October, 1979 through June, 1980, averaged, therefore, even more than $136 above corresponding consumer purchase prices during the remainder of the period analyzed to the extent that dealer costs of protective packages were higher or that protective packages were more frequently applied to Toyota vehicles during the period of the challenged program.

Dr. Berry's study suggested that Dealer costs of port-installed protective packages were $36 more during most of the period October, 1979 through June, 1980, than prior to that period. Thus, the analysis indicated that most consumers paid an average of $172 more for a 1980 Toyota during the alleged conspiracy. However, it did not take into account the benefit, if any, consumers received by obtaining the protective package option.

Plaintiffs' economic evidence suggests that the proposed recovery for individual plaintiffs under the various settlement agreements falls within the possible range of adequate settlements. Purchasers in Delaware, Virginia, Maryland, and the District of Columbia will still have the $135 cash/$250 in goods and services option that this Court preliminarily approved in an earlier opinion. Although there are increased restrictions on the goods and services op-

tion which cause this Court to question the desirability of this option from the consumers perspective, this Court does not find that those restrictions render the settlement inadequate for purposes of preliminary approval. The flat award of $150.00 in Pennsylvania also appears to be within the range of adequacy: the damages proposed for purchasers in that state may well reflect an appropriate balancing of the possible fatal indeterminancy of damages on the one hand and the potential for trebling damages on the other. *See* 564 F.Supp. at 1385. The award of $125.00 in West Virginia similarly appears adequate in light of the insolvency of three out of the eight Dealer defendants and the consequent reduced likelihood of recovery on a litigated judgment. *See In Re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305, 316 (D.Md.1979).

Considering all these factors as well as the economic evidence, but without prejudging the issue, the Court finds the proposed settlement agreements to be within the "possible range" of "adequacy." However, the Court notes its continuing concern about certain provisions in the Original Settlement Agreement which have been incorporated into these agreements. *See* 564 F.Supp. at 1386. Yet, as with that Agreement, those concerns do not constitute grounds at this stage for summarily rejecting plaintiffs' carefully crafted proposals. *Id.*

NOTICE

■ Plaintiffs have submitted a proposed plan of notice which provides for the following schedule:

*May 2, 1984* —Plaintiffs complete identification of the names and last known addresses of all purchasers of new 1980 Toyotas purchased from the Dealer defendants.

*May 11, 1984* —Notices mailed to purchasers informing them of the preliminary identification of their status to participate/not participate in the settlements. With respect to persons whose

eligibility is undetermined a claim form will be attached.

*May 20, 1984* —Notice by publication in newspapers of general circulation in the middle Atlantic region.

*May 21, 1984* —Notice by publication in newspaper of national circulation.

Plaintiffs have also submitted copies of the proposed notices to be mailed, the proposed notice to be published, and the proposed claim form to be submitted to those persons whose eligibility is undetermined. Defendants have objected to two statements in Pennsylvania's proposed notice for mailing. After careful consideration of plaintiffs' submissions and defendants' objections, this Court approves the proposed plan of notice and notice content.

Section 4c(c) of the Clayton Act, 15 U.S.C. § 15c(c) provides:

> An action under subsection (a)(1) of this section shall not be dismissed or compromised without the approval of the court, and notice of any proposed dismissal or compromise shall be given in such manner as the court directs.

This requirement is identical to Fed.R. Civ.P. 23(e) requiring notice of any proposed dismissal or compromise in accordance with the Court's direction. In the seminal case of *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 175–77, 94 S.Ct. 2140, 2151–52, 40 L.Ed.2d 732 (1974), the Court held that under Rule 23(c)(2) individual notice should be given to all class members who can be identified through reasonable efforts to satisfy due process. The requirement of individual notice has been extended to dismissals and compromises of class action pursuant to Fed.R.Civ.P. 23(e). *See, e.g., Grunin v. International House of Pancakes,* 513 F.2d 114, 120–21 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Section

4c(c) is silent with respect to the type of notice to be used in the dismissal or compromise of *parens patriae* actions. Because this litigation concerns both *parens patriae* and Rule 23 class actions and in light of the similarity in language between Section 4c(c) and Fed.R.Civ.P. 23(e), this Court will apply the same standards to the *parens patriae* action as to the Rule 23 action.[4]

### Plan of Notice

Plaintiffs have proposed a plan of notice utilizing notice by first class mailing followed by notice by publication. This appears to be an adequate and satisfactory method to meet due process concerns, since the identity of purchasers is available from defendants' records. Plaintiffs have indicated that they will attempt to correct addresses through telephone directories and motor vehicle records should any notices be undeliverable. The notice by publication is intended to reach those purchasers who cannot be identified as the result of the loss of records by Dealer defendants. The Court therefore approves plaintiffs' proposed plan of notice.

### Notice Content

The plaintiffs have also submitted proposed notices for publication and mailing. The notices for mailing contain a brief description of the nature of the litigation, list the Dealer defendants, and provide a procedural history of the relevant *parens patriae* actions and the private actions. The notices also state that plaintiffs have conducted an economic analysis which indicates that the average increase in gross profits on 1980 Toyotas received by Dealer defendants was approximately $136 as a result of the conspiracy. Each notice describes the terms of the proposed settlement applicable to the notice recipient, including eligibility and expected recovery

---

**4.** Although the comparable provision to Fed.R. Civ.P. 23(c)(2) in the *parens patriae* amendments to the Clayton Act provide for notice by publication of the pendency of *parens patriae* actions, unless the Court finds that such publica-

tion would not satisfy due process, it seems clear that Congress' intent in enacting this provision was to simplify the notice procedures in *parens patriae* actions. *See, e.g.,* S.Rep. No. 94–803, 94th Cong., 2d Sess. 46 (1976).

under the settlement. The notices indicate that a $100,000 fund to reimburse plaintiffs' counsel has been established and that counsel may also receive payment from accumulated interest from the Settlement Fund. It informs purchasers who have been determined to be ineligible how they can contest that determination. A claim form for those individuals whose eligibility has not yet been determined has also been included where appropriate. Purchasers are informed that approval of the settlement will result in dismissal of the case with prejudice to plaintiffs and all individuals and business entities that plaintiffs represent, and that further claims arising from these transactions (except those arising from licensing statutes regarding warranty obligations) will be barred unless the individuals or business entities have excluded themselves. The notices also indicate how individual or business entities should exclude themselves from the private actions should they so desire. The notices specify the time and place for the hearing concerning final approval of the settlements and informs notice recipients how to participate in the hearing. The notices state that any one who fails to comply with the provisions regarding objections to be made at the hearing will be deemed to have waived any objections they may have. The published notices simply inform purchasers of new 1980 Toyotas that they may be entitled to recovery and direct them to write to the Settlement Committee if they have not recently received a notice.

Pennsylvania Dealer defendants have objected to certain provisions in the proposed Pennsylvania notice for mailing on the grounds that they imply that the Dealer defendants are guilty of antitrust violations, and thereby jeopardize Dealer prospects for future business. Specifically Dealer defendants object to the following language concerning the results of plaintiffs' economic analysis:

Plaintiffs, through the Pennsylvania Attorney General and the attorneys representing the Golub Class, have conducted extensive pretrial investigation and discovery of the facts and circumstances underlying the issues raised in the lawsuits. The investigation showed that the amount of any alleged overcharge paid by a purchaser depended in part upon the amount of the discount obtained on the price of the new 1980 Toyota or the amount of the allowance given on any trade-in involved in the purchase. In this regard, plaintiffs undertook an analysis of sales of new Toyota motor vehicles in the middle Atlantic region. This analysis which defendants would contest at trial, indicated that the average increase in gross profits on 1980 Toyotas received by the defendant Toyota dealers as a result of the alleged conspiracy was approximately $136.

Defendants claim that the increase in gross profits is irrelevant to the amount of damages suffered by the consumers in this litigation. Defendants propose instead language that states that the Court has ruled that the amount of damages an individual consumer has suffered is the difference between what he paid for a Toyota with a protective package and what he would have paid for a Toyota with a protective package absent the conspiracy. The proposed language states that damages would range from nothing to $420.00, and that plaintiffs feel that the proposed settlement figure is reasonable and fair since it eliminates the need to calculate damages on an individual basis.

Defendants also object to the language concerning defendants' motion to dismiss and appeal to the Fourth Circuit. They suggest that instead the notice should simply state that "Various motions were filed by the defendants and disposed of by the Court." Defendants claim that the language proposed by plaintiffs suggests the Dealers were forced to settle for even more than their profits because their case was so weak.

Plaintiffs respond that the language concerning the economic analysis should be

retained to permit Toyota purchasers to make an informed evaluation of the settlement. They assert that according to their economic experts the $136 figure is the best measure of damages. They also argue that the specific language defendants propose incorrectly assumes that plaintiffs would have to prove damages on an individual basis. In addition, plaintiffs state that based upon consumers' inquiries they believe that purchasers of 1980 Toyotas with protective packages assume that their single damages amount to $500. With regard to the procedural history, the plaintiffs argue that this information is necessary since notice mailed to purchasers in March 1982 referred both to the appeal, and the fact that a determination of the issue in favor of the defendants would terminate the cases without recovery.

■ Although no rigid standards govern the contents of settlement notice to class members, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." *Grunin v. International House of Pancakes*, 513 F.2d at 122. Moreover, on its face the notice must be neutral and emphasize that the court is expressing no opinion on the merits of the case or the amount of the settlement. *Id.* To effect this neutral apprisal "the notice may consist of a very general description of the proposed settlement, including a summary of the monetary or other benefits that the class would receive and an estimation of attorneys' fees and other expenses." *Id. See also Manual for Complex Litigation* § 1.46.

The notices for mailing proposed by plaintiffs generally meet these requirements. Although this Court is sensitive to the concerns that defendants express regarding inclusion of the economic analysis, this Court finds plaintiffs' language appro-

priate. This Court has recently stated that damages fall within a specific range of $0 to $535.00, but that "the precise extent of damages ... is not altogether clear." 564 F.Supp. at 1385. Reference to Dr. Berry's analysis aids consumers in evaluating the proposed settlement within the known range of damages. The Court also finds the language concerning the outcome of the appeal relevant and appropriate when the previous notice informed purchasers that such an appeal was pending.

The Court notes that the proposed notices do not include a provision for the receipt of written comments from those purchasers unable to attend the July hearing in person. This Court finds such a provision desirable, *see Manual for Complex Litigation* § 1.46, and directs that it be included in the notices for mailing. As for the notices for publication, this Court finds their brevity cause for concern. However, it finds those notices adequate and reasonable in light of the complexity of the proposed settlements.

TEMPORARY SETTLEMENT CLASS

In this Court's previous opinion preliminarily approving the proposed Settlement Agreement, the Court conditionally determined a Temporary Settlement Class. *See* 564 F.Supp. at 1388–91. Because notice will issue to consumers, that Temporary Settlement Class will not dissolve at this time. However, should the Court not give final approval to the proposed settlements, that class would expire in accordance with rulings enunciated in the May 27, 1983 opinion.