In re MID–ATLANTIC TOYOTA ANTITRUST LITIGATION.

STATE OF MARYLAND ex rel. SACHS

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

STATE OF DELAWARE ex
rel. GEBELEIN

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

STATE OF WEST VIRGINIA ex
rel. BROWNING

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

DISTRICT OF COLUMBIA ex
rel. ROGERS

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

COMMONWEALTH OF PENNSYLVA-
NIA on its own behalf and as
Parens Patriae

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

COMMONWEALTH OF VIRGINIA

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

Daniel E. GOLUB, et al.

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

Wallace H. JOHNSTON, Jr., et al.

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

No. MDL–456.

Civ. A. Nos. Y–80–3238, Y–81–650, Y–81–726, Y–81–805, Y–81–1880, Y–82–479, Y–81–806 and Y–81–2954.

United States District Court,
D. Maryland.

Sept. 24, 1984.

See also, D.C., 92 F.R.D. 358.

Michael F. Brockmeyer, Asst. Atty. Gen., Baltimore, Md., liaison counsel for plaintiffs.

Joseph L. Bianculli, Washington, D.C., liaison counsel for defendants.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

This multidistrict antitrust litigation involves six *parens patriae* actions, 15 U.S.C. § 15c, and two private treble damages actions, 15 U.S.C. § 15, which have been consolidated. All parties have reached compromised settlements of the claims, and have submitted their proposals to the Court for determination, required by Fed.R.Civ.P. 23(e) and 15 U.S.C. § 15c(c), as to whether the settlement is fair, reasonable, and adequate. The parties have also filed a joint application for award of counsel fees and costs. At a hearing on July 13, 1984, this court granted final approval of the proposed settlements for the reasons stated herein.

## HISTORY OF THE LITIGATION

The states of Maryland, Delaware, West Virginia, and the District of Columbia initiated this action in December, 1980. By September, 1981, the Commonwealths of Pennsylvania and Virginia, as well as the private plaintiffs, had filed suit. All the plaintiffs sued two classes of defendants: Toyota dealers in Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and the District of Columbia ("Dealer defendants"); and several entities essentially comprising the single Toyota distributor for the six jurisdictions ("Distributor defendants"). The plaintiffs alleged that all defendants conspired together in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, to force purchasers of certain new 1980 Toyotas to pay more for their cars than they would have paid in the absence of a conspiracy.

Over defendants' opposition all the actions were transferred to the District of Maryland for pretrial purposes by the Judicial Panel on Multidistrict Litigation. After the transfer, Distributor defendants moved to dismiss many of the actions on the ground that they were brought by, or on behalf of, indirect purchasers barred from financial recovery under *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). On June 30, 1981, this Court ruled that *Illinois Brick* did not bar plaintiffs' claims. *In re Mid-Atlantic Toyota Antitrust Litigation*, 516 F.Supp. 1287 (D.Md.1981).

Defendants also raised other grounds for dismissal including lack of personal jurisdiction over certain defendants, improper venue, failure to state a claim upon which relief can be granted, failure to comply with Rule 11, and the unconstitutionality of the Hart-Scott-Rodino Antitrust Improvements Act. On October 14, 1981, this Court upheld the constitutional authority of the governmental plaintiffs to pursue these actions but dismissed several defendants on the basis of jurisdiction and venue. The Court also denied the motions to dismiss based on Rule 11, while granting the mo-

tions to dismiss the Pennsylvania complaint for failure to state a claim for relief to the extent that it was based on a claim for damages under 15 U.S.C. § 14. *In re Mid-Atlantic Toyota Antitrust Litigation,* 525 F.Supp. 1265 (D.Md.1981). On December 22, 1981, this Court amended its opinion. *In re Mid-Atlantic Toyota Antitrust Litigation,* 541 F.Supp. 62 (D.Md.1981). At defendants' request, the issue of *parens patriae* authority was certified to the Fourth Circuit. That court affirmed the holding that the governmental plaintiffs had authority to pursue these actions. *Pennsylvania v. Mid-Atlantic Toyota Distributors, Inc.,* 704 F.2d 125 (4th Cir.1983).

In the interim, private plaintiffs sought class certification under Fed.R.Civ.P. 23(b)(3). In January, 1982, this Court denied these motions on the grounds that the fee arrangements between the named plaintiffs in the class action and their attorneys violated the ABA Code of Professional Responsibility, while noting that it did not intimate "that there has been or that there will be improprieties on the part of counsel in the instant case." *In re Mid-Atlantic Toyota Antitrust Litigation,* 93 F.R.D. 485, 487, 491 n. 9 (D.Md.1982).

Substantial discovery occurred during the winter and spring of 1981–82. Eventually approximately 500,000 documents, selected from transactional records, were organized in a document depository in Baltimore.

On October 29, 1982, this Court heard argument on summary judgment motions filed by defendants raising three principal issues: (1) whether defendants' conduct would be scrutinized on a *per se* or rule of reason basis, (2) whether sufficient evidence had been developed to infer that a § 1 "contract, combination or conspiracy" existed among the defendants, and (3) whether plaintiffs had alleged an antitrust injury to the Toyota purchasers. On April 4, 1983, the Court ruled that plaintiffs' claims would be considered under the *per se* standard, that sufficient facts regarding conspiratorial activities had been developed, and that purchasers of Toyotas under the Double Value Days Program did not suffer antitrust injury. *In re Mid-Atlantic Toyota Antitrust Litigation,* 560 F.Supp. 760 (D.Md.1983).

Settlement discussions continued throughout the litigation. On May 27, 1983, this Court preliminarily approved a proposed settlement ("Original Settlement Agreement") between all plaintiffs and the Distributor defendants. *In re Mid-Atlantic Toyota Antitrust Litigation,* 564 F.Supp. 1379 (D.Md.1983). Designed to achieve a "global" resolution of this litigation, the Original Settlement Agreement gave each Dealer defendant the option of joining in the settlement. When an insufficient number of Dealer defendants chose to "opt-in," plaintiffs continued the litigation against the remaining defendants, while engaging in negotiations in a renewed attempt to achieve a global settlement. Plaintiffs eventually concluded settlements with all remaining defendants, and the Court preliminarily approved these settlements on May 9, 1984. *In re Mid-Atlantic Toyota Antitrust Litigation,* 585 F.Supp. 553 (D.Md.1984). Notice of the proposed settlements was mailed to purchasers on May 11, 1984, and notice by publication was made on May 20–21, 1984. A hearing on final approval of the proposed settlements and the joint fee petition was held on July 13, 1984.

The Court has already provided detailed summaries of the proposed settlements in the litigation, *see In re Mid-Atlantic Toyota Antitrust Litigation,* 564 F.Supp. 1379, 1382 (D.Md.1983); *In re Mid-Atlantic Toyota Antitrust Litigation,* 585 F.Supp. 1553 (D.Md.1984), and will presume familiarity with the terms of the proposed settlements.

STANDARDS FOR APPROVAL

■ The standard for determining whether a proposed settlement should be approved, is whether the settlement is "fair, reasonable and adequate." *Manual on Complex Litigation* § 1.46 at 56–57 (5th ed. 1982). In *In re Mid-Atlantic Toyota Antitrust Litigation,* 564 F.Supp. 1379 (D.Md.1983), and *In re Mid-Atlantic Toyota Antitrust Litigation,* 585 F.Supp. 1553

(D.Md.1984), the Court followed the bifurcated analysis of late Judge Blair of this District. That analysis includes separate inquiries on the "fairness" and the "adequacy" of the proposed settlement. On the element of "fairness," Judge Blair stated:

> The factors tending to reveal the fairness of a settlement are those which indicate the presence or absence of collusion among the parties. Because of the danger of counsel's compromising a suit for an inadequate amount for the sake of insuring a fee, the court is obligated to ascertain that the settlement was reached as a result of good-faith bargaining at arm's length. The good faith of the parties is reflected in such factors as the posture of the case at the time settlement is proposed, the extent of discovery that has been conducted, the circumstances surrounding the negotiations and the experience of counsel.

*In re Montgomery County Real Estate Antitrust Litigation*, 83 F.R.D. 305, 315 (D.Md.1979). In addressing the second element of "adequacy" Judge Blair stated:

> In evaluating the 'adequacy' of a proposed settlement, the court must weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement. This necessarily requires the court to make a careful assessment of all the facts and a thorough analysis of the applicable law. It is not, of course, necessary or desirable to 'try' the case to determine whether a settlement is adequate since the very purpose of settlement is 'to avoid the trial of sharply disputed issues and to dispense with wasteful litigation.'
>
> In assessing the adequacy of the proposed settlement, courts should weigh the amount tendered to the plaintiffs against such factors as (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement.

*Id.* at 315–16 (citations omitted).

FAIRNESS

■ This Court concludes that the settlements were reached as a result of good faith bargaining at arms length. The negotiations resulting in these settlements were conducted by members of the Attorneys General offices of the states involved, a partner in a prominent litigation firm, and a former Attorney General of the United States. The settlements emerged after three and a half years of complex, hard-fought, litigation which resulted in one appellate opinion and numerous rulings by this Court. Indeed, the comprehensiveness and intricacy of the settlements suggests the professionalism behind them. In short, there is nothing to suggest that the settlements were reached prematurely, that the parties colluded, or that the negotiations were conducted in anything but good faith. This Court has no difficulty in concluding that the settlements were reached in an entirely appropriate manner.

ADEQUACY

Relying on the factors articulated by Judge Blair, this Court initially notes that in this case plaintiffs estimate that seventy-five percent of the approximately 50,000 purchasers of 1980 Toyotas are qualified to receive the benefits of the settlements. Approximately eighty-five to ninety percent of these purchasers will be, or have been, located and, therefore, will actually receive these benefits. The purchasers will recover anywhere from $125.00 in cash to $250.00 in a service and goods option for each car purchased. The plaintiffs have introduced economic evidence which suggests that Dealer defendants averaged $136 more in gross profit per Toyota as a result of the alleged conspiracy and that consumers paid between $172 and $249 (cost plus gross profit) more for their Toyotas as a result of the conspiracy. *See In re Mid-Atlantic Toyota Antitrust Litigation*, 585 F.Supp. 1553 (D.Md.1984). The total

settlement amount is approximately $5.1 million. In light of this evidence, the Court concludes that the amount purchasers will receive will adequately and fairly compensate them for their actual loss as a result of the alleged conspiracy.

This recovery weighed against the relative strength of the plaintiffs' case on the merits indicates that the proposed settlements are adequate. In its summary judgment ruling, this Court implied that the case would probably go to the jury on a *per se* theory of antitrust liability. If the case did go to the jury, a plaintiffs' verdict would be a significant possibility. However, the summary judgment ruling only resolved the issue of antitrust injury on the level of facial allegations; it did not foreclose the possibility of a directed verdict for defendants on that basis should it appear appropriate. *In re Mid-Atlantic Toyota Antitrust Litigation*, 560 F.Supp. at 784–86. Under such circumstances, the proposed settlements reflect an adequate balance between the possibility of a finding of no damages on the one hand, and the potential trebling of damages on the other. Indeed, the Court finds the balance particularly appropriate when continuation of this litigation would certainly entail significant costs for all involved.

The almost complete absence of opposition to the settlements also supports a finding of adequacy in this case. Notice was sent to the 50,000 purchasers of 1980 Toyotas. The notice invited consumers to submit comments on the proposed settlements either in writing or in person at the July 13 hearing. No consumers appeared at the hearing and only eight mailed objections to the Court. Of these eight none responded when the Attorneys General offices sent letters detailing the reasons behind the settlements' terms. Moreover, after reviewing the specific objections, which primarily concern the amount of the recovery and the requirements that the consumers have paid $425 or more for a protective package to qualify for the benefits, this Court does not find that the dissatisfaction expressed by these individuals renders the settlements inadequate.

In summary, the weight of these factors leads this Court to the conclusion that the proposed settlements are fair, reasonable and adequate. The Court, therefore, grants final approval to the settlements. In reaching this conclusion, the Court notes that many of the concerns which it expressed in earlier opinions regarding the terms of the proposed settlements have been allayed by plaintiffs' counsel's vigorous efforts to locate all eligible consumers. *See In re Mid-Atlantic Toyota Antitrust Litigation*, 564 F.Supp. 1379, 1386, 1387 (D.Md.1983). Moreover, the fact that the settlements paint with a broad brush as to individual recovery does not persuade the Court that the settlements are indeed inadequate. The Court suspects that the administrative difficulties in individualizing recovery would prove to be exceedingly complex and costly.

Plaintiffs have also submitted motions to dismiss defendants College Toyota, Inc., Import City, Inc., Mountain View Toyota, Inc., Valley Toyota, Inc., and Henry Kehl Enterprises, Inc. As noted in this Court's May 9, 1984 Memorandum and Order, these defendants are insolvent, in bankruptcy proceedings, or going out of business. *In re Mid-Atlantic Toyota Antitrust Litigation*, 585 F.Supp. 1553 (D.Md.1984). No objections to the motions to dismiss were received by the Court. Qualified purchasers from these Dealer defendants will receive settlement benefits consistent with other qualified purchasers. Under these circumstances, the Court grants the motions to dismiss.

## JOINT FEE PETITION

■ Pursuant to 15 U.S.C. § 15c(d)(1) and 15 U.S.C. § 15, plaintiffs' counsel, including two law firms representing the private plaintiffs, five state Attorneys General, and the Corporation Counsel for the District of Columbia have filed a joint petition for fees and costs seeking the award of a $100,000 fund established by the Original Settlement Agreement with Distributor defendants, for the purpose of reimbursing out-of-pocket expenses incurred in litiga-

tion. Counsel intend to use the fund to reimburse each state's contribution to a $89,749 cost sharing fund established in 1981. The balance remaining after such reimbursement will be allocated to the private plaintiffs in the amount of $5,000 in partial reimbursement of litigation expenses, and to the state of Maryland in partial reimbursement of expenses associated with economic experts. Plaintiffs also seek an award of interest accruing on the settlement funds (an estimated $321,998 attributable to Distributor defendants and an estimated $135,896 attributable to Dealer defendants as of September 1, 1984), as reimbursement for expenses not covered by the $100,000 fund, and as an award of attorneys' fees. The various settlement agreements, *see In re Mid-Atlantic Toyota Antitrust Litigation,* 564 F.Supp. 1379 (D.Md.1983); 585 F.Supp. 1553 (D.Md. 1984), provide that interest which is generated on amounts previously deposited or deposited in the future can be utilized for the payment of attorneys' fees and costs. Plaintiffs estimate that interest will continue to accumulate on the funds during the time necessary for individual consumers to make claims for damages and to negotiate checks, and for various Dealers to present their claims for payment. Plaintiffs request that the interest accruing on the principal contributed by Distributor defendants through September 1, 1984 be awarded on the following percentage basis:

| | |
|---|---|
| Maryland | 48.42% |
| Pennsylvania | 19.84% |
| Virginia | 12.63% |
| Private Plaintiffs | 13.98% |
| Delaware | 2.37% |
| District of Columbia | 1.99% |
| West Virginia | 0.77% |
| TOTAL: | 100.00% |

Plaintiffs state that this allocation reflects factors agreed upon by plaintiffs, which include number of purchasers represented, amount of attorney and paralegal time expended, expense of retaining and supervising economic experts, and the overall contribution of various counsel to the prosecution. The five governmental plaintiffs seek an award of interest accruing on the princi-

pal contributed by Dealer defendants in the following amounts:

| | |
|---|---|
| Pennsylvania | $53,911 |
| Maryland | $36,697 |
| Virginia | $35,563 |
| Delaware | $ 5,110 |
| District of Columbia | $ 4,615 |
| TOTAL: | $135,896 |

Plaintiffs state that these figures reflect agreement among plaintiffs' counsel that these government attorneys are entitled to interest generated by settlements with Dealer defendants within their respective jurisdiction with the exception of the District of Columbia Corporation Counsel which is allocated a fixed sum since the District of Columbia has no dealerships physically located within its boundaries. Plaintiffs' counsel will submit supplemental applications for awards of additional counsel fees and expenses to the Court from the interest accruing on the settlement funds after September 1, 1984.

The Fourth Circuit has expressly adopted the criteria established in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), for determining appropriate attorneys' fees. *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir.1978). The twelve *Johnson* factors are as follows:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Allen v. Burke,* 690 F.2d 376, 379 (4th Cir.1982).

In *Anderson v. Morris,* 658 F.2d 246, 249 (4th Cir.1981), the Fourth Circuit articulat-

ed a method for applying these factors because it recognized that "merely providing a checklist of factors to consider does not lead to consistent results, or, in many cases, reasonable fees." The *Anderson* decision stated:

> The Court of Appeals of the Fifth Circuit, progenitor of the *Johnson* factors, has recognized these problems. It therefore has instructed district courts to first ascertain the nature and extent of the services supplied by the attorney from a statement showing the number of hours worked and an explanation of how these hours were spent. The court should next determine the customary hourly rate of compensation. These are essentially *Johnson* factors 1 and 5. The court should then multiply the number of hours reasonably expended by the customary hourly rate to determine an initial amount for the fee award. Finally, the court should adjust the fee on the basis of the other factors, briefly explaining how they affected the award. *In re First Colonial Corp. of America*, 544 F.2d 1291, 1298–1300 (5th Cir.1977). *See also Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 581–84 (5th Cir.1980). We endorse this manner of applying the *Johnson* factors.

658 F.2d at 249. More recently, the Fourth Circuit has noted that "the district court is not required to engage in a lengthy discussion concerning what portion of the award is attributable to which [*Johnson*] factor ... [for], as the United States Supreme Court noted in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), many of the *Johnson* factors 'are subsumed within the initial calculation of hours reasonably expended at reasonable hourly rate and need not be further considered at all.'" *Arnold v. Burger King Corp.*, 719 F.2d 63, 67 n. 4 (4th Cir.1983).

Under these principles the first inquiry to be made is the nature and extent of the services supplied by the attorneys. In support of their petition, plaintiffs have submitted affidavits containing summaries of attorney time, and in one instance, paralegal and attorney time. *See* fn. *infra.*

These summaries separately account for the numbers of hours spent on such matters as pre-complaint investigation, legal research and preparation of the complaint, coordination with plaintiffs' counsel, discovery, post-complaint investigation, preparation of matters for the Judicial Panel for Multidistrict Litigation, attendance at pretrial status conferences, preparation of responses to motions to dismiss, requests for investigative materials from the United States Department of Justice, preparation of materials for the Fourth Circuit, preparation of initial notice to consumers, preparation of response to motion to summary judgment, preparation of damage theory and analysis, preparation of motions to transfer, trial preparation, settlement negotiations and administration, and miscellaneous. The total numbers of hours spent by each Attorneys General office, Corporation Counsel for the District of Columbia, and the two private law firms are as follows:

| | |
|---|---|
| Delaware | 833.0 |
| Maryland | 10,042.2 |
| Pennsylvania | 5,909.3 |
| Virginia | 3,679.8 |
| West Virginia | 585.2 |
| District of Columbia | 942.7 |
| Titus, Marcus and Shapira | 937.5 |
| Ladenheim and Campbell | 437.9 |
| TOTAL: | 23,367.6 |

Besides these figures, the state of Delaware and the District of Columbia estimate that an additional 1400 hours and 2125 hours, respectively, were spent by their offices although time records are now unavailable. Plaintiffs do not seek reimbursement for these undocumented hours at this time.

In calculating the "lodestar" amount, the number of hours reasonably worked times the customary hourly rate, the Court relies on plaintiffs' figures as an accurate representation of the hours spent by the attorneys involved. Such hours are reasonable in light of the enormity of this litigation. Although some duplication of effort may have occurred, *see Hensley v. Eckerhart*, 461 U.S. at 434–37, 103 S.Ct. at 1940–41, 76 L.Ed.2d at 51–52, such duplication was not excessive or unnecessary.

The plaintiffs have not provided figures as to the customary hourly rate of compensation for the type of work performed in this case. However, they have suggested a hypothetical figure of $50.00 per hour. This is a reasonable, but low, approximation of the customary hourly fee. Using this figure to determine the "lodestar" amount, the Court is presented with the following figures:

| | |
|---|---|
| Delaware | $ 41,650.00 |
| Maryland | $502,110.00 |
| Pennsylvania | $295,465.00 |
| Virginia | $183,990.00 |
| West Virginia | $ 29,260.00 |
| District of Columbia | $ 47,135.00 |
| Titus, Marcus and Shapira | $ 46,875.00 |
| Ladenheim and Campbell | $ 21,895.00 |
| TOTAL: | $1,168,380.00 |

As plaintiffs note, these lodestar figures exceed the approximately $550,000 and $600,000 which the settlement fund can be expected to generate.

■ Application of the *Johnson* factors indicates that this lodestar figure is subject to both downward and upward adjustment. The factor suggesting downward adjustment is the result obtained with regard to the class certification issue. In *In re Mid-Atlantic Toyota Antitrust Litigation,* 93 F.R.D. 485 (D.Md.1982), this Court denied plaintiffs' motion for class certification because the fee arrangement was in violation of the Code of Professional Responsibility. In the joint fee petition, the plaintiffs indicate that attorneys spent the following amounts of time on the class certification issues: Delaware 6 hours, Maryland 32.8 hours, Pennsylvania 10.6 hours, the Ladenheim firm 104.6 hours, and the Titus firm 235 hours.* The Court finds it inappropriate to award attorneys' fees on this issue in light of its previous ruling. *Cf. Hensley v. Eckerhart, supra,* 461 U.S. at 434–37, 103 S.Ct. at 1940–41, 76 L.Ed.2d at 51–52 (district court may identify certain hours to be

eliminated from fee award where plaintiff met with limited success). Even if the lodestar figure is adjusted downward plaintiffs' counsel are still receiving less than the adjusted lodestar figure of $1,149,430.

The factor suggesting upward adjustment is the novelty and difficulty of the questions raised. Plaintiffs were required to overcome significant obstacles such as the *Illinois Brick* doctrine, jurisdiction and venue, and issues regarding the theory of liability. Indeed, at an early stage in the litigation this Court noted that plaintiffs "have a long and tortuous road ahead in seeking to prove the existence of the voluntary conspiracy which they allege." *In re Mid-Atlantic Toyota Antitrust Litigation,* 516 F.Supp. at 1296–97. Moreover, throughout these arduous proceedings, counsel's performance has been of the highest caliber. The Court, therefore, concludes that an upward adjustment of the lodestar figure is appropriate. However, it will not put an exact figure on that adjustment at this time, since there is no indication that plaintiffs' counsel will recover even the downwardly adjusted lodestar figure. If at a later time it appears that the funds available exceed the adjusted lodestar figure of $1,149,430 this Court will entertain a motion to readjust the lodestar figure.

Plaintiffs have also submitted summaries of out-of-pocket expenses. These summaries separately itemize the costs by the following categories: court costs, contribution to governmental entities cost sharing fund, transcripts, travel, contractual personnel, document duplication, expert witness fees, photocopying, long distance telephone charges, postal, and miscellaneous. The total cost incurred by each Attorneys General office, Corporation Counsel for the District of Columbia, and the two private law firms are as follows:

---

* The affidavit submitted by the Titus firm did not specify the number of hours spent on the class certification issue. The Court has therefore assumed that it spent approximately the same percentage (24%) of time on that issue as did the other firm representing the private plaintiffs. The Court, however, suspects that the figure of 225 hours may be somewhat inflated since the Titus summary of hours included both paralegal and attorney time. But since the total award apparently will not come close to the lodestar figure even if the Titus figures were totally omitted, the Court will not require greater specificity at this time.

| | |
|---|---|
| Delaware | $ 6,434.44 |
| Maryland | $85,626.56 |
| Pennsylvania | $95,034.60 |
| Virginia | $59,131.38 |
| West Virginia | $ 7,511.97 |
| District of Columbia | $10,617.51 |
| Titus, Marcus and Shapira | $12,947.42 |
| Landenheim and Campbell | $ 6,702.97 |
| TOTAL: | $284,006.85 |

In holding that most litigation expenses are recoverable as attorneys' fees, the Fourth Circuit stated:

> [T]he question is whether the statutory authorization of reasonable attorneys' fees are intended to include litigation expenses. We hold that it was.
>
> Litigation expenses such as supplemental secretarial costs, copying, telephone costs and necessary travel, are integrally related to the work of an attorney....

*Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623 (footnotes omitted).

■ The Court finds that plaintiffs' costs in this case are reasonable litigation expenses. The only item which causes the Court to pause is the expert witness fee. In *Wheeler,* the Fourth Circuit noted that the fees and expenses of outside, non-legal consultants and experts "are traditionally not regarded as attorneys' fees, however essential their services may be to the successful preparation and trial of a complex case." 585 F.2d at 624. However, the Eighth Circuit recently observed that "[w]ith increasing frequency ... federal courts have suggested that the prevailing party may recover expert witness fees when the expert's testimony was crucial to the resolution of the case." *Paschall v. Kansas City Star Co.,* 695 F.2d 322 (8th Cir.1982). In *Paschall,* the Court held that for expert witness fees to be recoverable, the district court must find that the testimony of the expert was "indispensable" or "crucial" to the issues decided below. *Id.* at 339. In this case, the affidavits of the economic experts were crucial in determining the fairness and adequacy of the proposed settlements. As the *Manual for Complex Litigation* § 1.46 emphasizes, the need of the court for reliable economic data

concerning the damage suffered by the class as a result of the alleged illegal conduct is great in complex civil antitrust class actions; without such data "a rational determination of what is fair, reasonable, and adequate cannot be made." In this case, plaintiffs' economic evidence was essential to this Court's grant of final approval to the settlements. Therefore, these costs will be allowed.

■ Plaintiffs have filed the fee petition as a joint petition. They state that the proposed allocation of fees and costs amongst the various counsel presents a fair division, and that the allocation reflects a number of factors which have been discussed thoroughly and agreed upon by all. Under such circumstances, the Court declines to interfere for in complex litigation of this nature "it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk." *In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395 (D.D.C.1978). The Court will not alter the allocations as set forth in the joint petition. However, should plaintiffs find the allocations inappropriate in light of its rulings on attorneys' fees issues, they should notify this Court as to any proposed changes in the allocations.

As a final note, the Court turns to the only issue that was contested at the July 13 hearing, whether a consumer who purchased a 1980 Toyota which did not have two or more of the five elements of the package actually on the car, but which did have a sticker listing the elements as available options for the car is entitled to participate in the settlement. This is a question of fact which the Settlement Committee should resolve as provided by the settlement agreements.

### ORDER

In accordance with the statements in the Memorandum attached hereto, it is this 24th day of September, 1984, by the United States District Court for the District of Maryland, ORDERED:

449

1. That the proposed settlements BE, and the same ARE, hereby APPROVED;

2. That the motions to dismiss BE, and the same ARE, hereby GRANTED; and

3. That the Joint Application for Award of Counsel fees and costs BE, and the same IS, hereby GRANTED in part and DE-NIED in part.